STATE OF MISSOURI upon the information of ROY McKITTRICK, Attorney General, Relator, v. GLOBE-DEMOCRAT PUBLISHING COMPANY, a Corporation.—110 S. W. (2d) 705.

Court en Banc, December 9, 1937.

*Roy McKittrick*, Attorney General, *Franklin E. Reagan* and *John W. Hoffman, Jr.*, Assistant Attorneys General, for relator.

*Igoe, Carroll, Higgs & Keefe, Bryan, Williams, Cave & McPheeters* and *Jones, Hocker, Gladney & Grand* for respondent.

ELLISON, J.—*Quo warranto* instituted in this court by the Attorney General to forfeit the charter of the respondent Globe-Democrat Publishing Company, a corporation, on the ground that at and prior to the filing of the information it was operating a lottery. The respondent publishes the St. Louis Globe-Democrat, a daily and Sunday newspaper. The alleged lottery, conducted by and advertised in that newspaper, was called the "Famous Names" contest. The respondent filed a return admitting it had conducted the contest but denying that the same was a lottery. To that return the relator filed a reply which was a general denial. The Honorable Fielding P. Stapleton of the Gentry County bar was appointed by this court as Special Commissioner to receive the testimony and evidence and to report his findings of fact and conclusions of law. His report has been of great assistance to the court and we adopt substantially his statement of the facts—without quotation marks—adding, however, some further detailed facts because of the contentions made by the parties in their briefs filed after the report was presented.

Early in 1936 the respondent contracted with the Publishers' Serv-

ice Company of New York to publish in the Globe-Democrat the aforesaid "Famous Names" contest, which was copyrighted by the New York Post, one of several publications owned by Stearns Newspapers, the latter also controlling the Publishers' Service Company. Under the contract the Publishers' Service Company was to furnish and the Globe-Democrat was to publish a series of eighty-four cartoons, one each day for eighty-four consecutive days. The cartoons were prepared by Peter Arno, a widely known cartoonist, and consisted of drawings of persons, inanimate and living objects, together with various statements or exclamations made by the characters portrayed; and under each cartoon was printed a list of words or names, one of which was to be chosen by the contestants as the best and most appropriate name for the cartoon. The prizes were to be awarded by a committee of five distinguished citizens of St. Louis. In the beginning the cartoons were comparatively simple and only a few names were appended thereto. As the contest proceeded they became more difficult and more names were printed under each. Toward the last as many as 180 names were suggested for some of the cartoons.

The rules of the contest having a bearing on the issues in this case were as follows:

"1. 'Famous Names' contest is open to every reader of The St. Louis Globe-Democrat with the exception of employees of The St. Louis Globe-Democrat and members of their families.

"2. Beginning Monday, February 3d, and continuing each day for twelve weeks, The St. Louis Globe-Democrat will publish a Peter Arno cartoon. Each cartoon will in some way suggest or represent a name. The name may be that of a person, city, state, nation, book, song or motion picture.

"3. The St. Louis Globe-Democrat will award a First Prize of $10,000.00 as part of $15,000.00 in prizes to the person or persons submitting the best or most appropriate name to each of the 84 cartoons and in all other ways conforming to these Official Rules. The person or persons submitting the best or most appropriate names to all 84 cartoons and otherwise complying with these Official Rules shall be eligible for First Prize. The person or persons submitting the next nearest correct solution to the 84 cartoons and otherwise complying with all these Official Rules shall be eligible for additional prizes in the order of the correctness of their answers.

"7. In order to qualify for a prize, the contestant is required to accompany each of the 12 series of answers with a remittance of 10 cents in coin in payment for a special print of the week's featured Peter Arno cartoon, purchase of which is a condition for entering the contest. The Special Prints, suitable for framing, will be mailed to the contestant in one set, at the close of the contest.

"8. Any person upon entering the contest and by the submission

of answers, agrees to accept as final the decision of The Globe-Democrat and the contest manager on all matters affecting the conduct of the contest, the making of the awards, and procedure and policy, with regard to the acceptance of submissions during the entire contest.

"10. A contestant is permitted to submit as many sets of 84 cartoons as he or she chooses, provided same are properly qualified, and each will be judged as a unit, but no person will be awarded more than one prize. When submitting additional sets of answers, all series must be identified as sets A, B, C, etc."

Before the contest started the respondent submitted to the Post Office Department the plan thereof together with the rules governing, and the same was approved as not being in violation of the postal laws. However, the cartoons with appended lists of names were not so submitted. Many of them had not yet been drawn and furnished to the respondent.

The publication of the cartoons in the St. Louis Globe-Democrat began on February 3, 1936, and was continued for eighty-four consecutive days, ending on April 26, 1936. At the outset the publication of the cartoons was accompanied by extravagant advertising, practically all of which was furnished by the Publishers' Service Company. For instance in the issue of February 8 it was stated, "in a half hour, perhaps less, you can give yourself the opportunity to win $10,000 cash." On February 9 an advertisement said "your quick way to fortune." And below that in smaller type, "time and again you read of the huge fortunes won by various contestants! Today the Globe-Democrat gives you this grand opportunity to win $10,000 cash." On the same page it was stated "every one in your family, man, woman or child is eligible to enter and win. A child of eight years might win." In several subsequent advertisements, one as late as March 18, it was stated that any man, woman or child can win $10,000 cash. An advertisement on February 16 prominently proclaimed: "You deserve some easy money, $10,000 first prize," and further stated, "Anyone can win, man, woman or child. A child of 12 might easily be awarded the first prize itself—a $10,000 cash fortune. It requires no special skill, training or education." In addition to the advertisements in the Globe-Democrat some 400,000 "broadsides" or printed folders were distributed from house to house throughout the St. Louis Metropolitan area, and advertisements were run in 446 small town newspapers in the territory tributary to the city.

On February 27 representatives of the Better Business Bureau in St. Louis had a conference with officers of the respondent corporation in which the latter stated that the contest would become more difficult as it went on, the cartoons to be susceptible of several possible con-

structions. At that time only about thirty-six of the eighty-four cartoons had been forwarded to the respondent by the Publishers' Service Company—in other words the respondent had not then seen the last forty-eight cartoons and did not know what they would contain. During the conference mention was made of the fact that the advertising was misleading and calculated to draw persons into the contest in the belief that it would be easy. At a second conference, about March 24, the same question was discussed. Mr. Hocker, attorney for the respondent, conceded the advertising was objectionable, and the respondent agreed to discontinue advertisement stating children might win in the contest. This was done. These conferences were held because the Better Business Bureau had received inquiries from the public and complaints from two competing St. Louis newspapers, the St. Louis Star-Times and the St. Louis Post Dispatch.

In the middle or latter part of February, after the contest had been running two or three weeks, the respondent was advised by the Attorney General that the St. Louis Star-Times had filed a complaint thereagainst. At a conference shortly following the Attorney General stated he objected to two things: (1) the fact the cartoons would be equally susceptible of various answers made it a lottery; (2) the determination of the contest by five local judges made it a guessing contest as to what the opinion of the five judges would be. Furthermore, he contended the judgment of the five judges would be more summary and the result of less study and reflection than the contestants themselves would bring to bear on the contest. It was suggested by the Attorney General that to obviate this second objection the contest might be judged by the puzzle experts who prepared the cartoons, thereby eliminating guesswork by the contestants as to what a jury of five local nonexperts might think. Mr. Hocker agreed to have this change made. And to meet the first objection, he wrote the Attorney General on March 6 agreeing for the respondent, as follows:

"Every cartoon will be designed and created by puzzle experts to most appropriately suggest some one of the names printed below it, and that name will be selected by these experts as the correct solution of the puzzle. While there may be clews and leads that will suggest some one or more of the other names, a careful analysis of the cartoon will be entertained and will point more fully and completely and perhaps in some cases more subtly to the intended one. There will not be any cartoon which will equally or (in) anything like the same degree point to other names than the designated one. The selection of the most appropriate name, which as stated, will be for all contest purposes the correct one, will especially in the more difficult puzzles bring into exercise the skill, knowledge, experience, ingenuity, observation and judgment of the contestants in bringing

together the material contained in the cartoon into one conception best represented by one name in the list."

Thus it will be seen the respondent endeavored to meet the objections made: by discontinuing reference to children in its advertising; by changing the method of judging the contest; and by attempting to eliminate ambiguity from the cartoons. We do not find anything in the record, however, showing the Attorney General agreed the foregoing changes would make the contest "law proof." After receiving the above-quoted letter the Attorney General took the matter under further advisement until April 6 when he wrote respondent's attorneys briefly that in his opinion the contest violated the lottery law of the State, and therefore the charter rights and powers of the respondent, and that the matter should be presented to the courts. This was after the contest had run sixty-four days of the allotted eighty-four-day period. The information in this case was filed a week later on April 13.

Upon receipt of the Attorney General's letter the respondent suggested to its attorney that they procure the opinion of two other prominent law firms in St. Louis. The two firms selected were Bryan, Williams, Cave & McPheeters, and Igoe, Carroll, Higgs & Keefe. Each was requested, independently of the other, to write an opinion on whether the contest was a lottery. Both firms taking the view that it was not, respondent continued the contest to its conclusion.

The answers submitted to the first week's set of cartoons numbered 69,665. Of these 45,200 contestants went clear through the contest and finished the eighty-four cartoons. The total receipts from the contest were $67,334.15. The disbursements were:

| | |
|---|---:|
| Publishers' Service Company | $26,167.04 |
| Salaries | 10,184.52 |
| Printing, stationery, etc., | 9,753.01 |
| Postage | 3,332.76 |
| Sundries | 1,189.05 |
| Prizes | 15,904.99 |
| | $66,551.37 |
| Net profit (not including Office Adv. expense) | $ 782.78 |

Allowing regular rates for respondent's advertising of the contest in its own newspaper, the cost thereof was $39,079.09, making a loss of $38,296.31 on the contest. The respondent's receipts from advertising were heavier during the first six months of 1936, which included the period when the contest was running, than they had been during the corresponding months the year before, but the respondent thought this was due to improved business conditions. Other

St. Louis newspapers showed the same proportionate increase in advertising. Likewise, in the months of February, March and April, 1936, while the contest was on, the sales of respondent's newspaper were heavier than in the months immediately preceding and following; but respondent attributed this to weather conditions and events of extraordinary news value having to do with Hauptman, the convicted kidnaper of the Lindbergh baby.

The purpose of the contest was to promote reader interest in the St. Louis Globe-Democrat. Advertising rates of a newspaper are based upon its circulation. Ordinarily its circulation depends upon the extent to which the reader interest in the newspaper is developed. It was for this purpose that the circulation department of the St. Louis Globe-Democrat conceived the idea of running the contest. Since May, 1935, thirty similar contests had then been run in twenty-one newspapers in the United States, there being three contests each in the Charleston (W. Va.) Gazette, the Peoria Journal-Transcript and the Portland (Ore.) News-Telegram; two contests in the South Bend Tribune, the Seattle Star and the Tacoma Times. All these had been conducted without Federal or State interference.

The contest resulted in a tie, there being only two contestants who made the correct selection of title for the entire eighty-four cartoons. The first prize of $10,000 and the second prize of $2000 were divided between them. There were thirty-six sets of answers with only one error. Of these it seems all but three failed on one cartoon, No. 80. Out of the thirty-three contestants misinterpreting this cartoon twenty-five picked the same wrong name. Of the 45,200 who went clear through the contest only about one per cent had the correct title for cartoon No. 80. The other cartoons which proved most troublesome were Nos. 74, 75, 79, 81 and 83. We set out these six cartoons with the titles selected therefor by the puzzle experts of the Publishers' Service Company..

The rule followed by the contestants, as several of them testified, in selecting the most appropriate title for a cartoon out of the list of names published thereunder, was to find the name connecting with the greatest number of different elements in the picture. In the beginning the contest was so easy that one entrant said it seemed all the contestants would be tied at the finish if it continued on the same plane. But the contest grew more difficult or "subtle" as it progressed. Toward the end it came to be a matter of "judgment" or guessing—undoubtedly guessing for the multitude of persons without special skill, training or education who had been invited by the advertising to join in the contest.

The respondent contends the interpretation of rebus puzzle is a science. One expert witness, Mr. Gregory Hartswick of Fanwood, New Jersey, was introduced who frequently throughout his testimony

THE NAME OF CARTOON No. 74 IS:
G in Jar+ROD+JARS
=GINGER ROGERS

THE NAME OF CARTOON No. 75 IS:
PEA+EATER+LORRY
=PETER LORRE

THE NAME OF CARTOON No. 79 IS:
(A)DOLL+PH H H+HIT+L+'ER
=ADOLPH HITLER

THE NAME OF CARTOON No. 80 IS:
CA+AND+DOLL+LIGHT (Child's Weight)
=CANDLE LIGHT

THE NAME OF CARTOON No. 81 IS:
JAY (Bird)+AIM+S+KIRK (Church)+WOOD
=JAMES KIRKWOOD

THE NAME OF CARTOON No. 83 IS.
EM(M)+INN (Scene)+KNEE+SEW+TEA+(T)+A
=MINNESOTA

used the expression "puzzle practice." He was head of the Creative Department of the Publishers' Service Company but had not become associated with that company until after it had furnished the eighty-four cartoons used by respondent in the contest. He said his business for fifteen years had been "doing puzzles;" that he had written books and magazine articles on the subject; that rebus puzzles trace back to the Mayan inscriptions in Central America and are found in the coats of arms of some of the distinguished families in the United States. He testified that he solved the eighty-four cartoon puzzles figuring in this case without knowing what titles had been selected by the company. He was asked by the commissioner the following questions and made the following answers:

"Q. As an expert in solving or constructing puzzles, have you any rule by which you can say what is the correct answer? In other words, show it by the answer that has the most direct objects in the answer without implication, or those having the fewest left to implication? A. No, sir; the rule is that the title is made up before the picture is drawn, the definite idea in mind. And I have tried to show, while there is not any absolutely hard and fast rule, certainly the one which had the most absolutely defined elements would be the correct title. To that extent there is a rule.

"Q. In other words, the rule is to go as little on implication in arriving at the title as possible? A. Always."

The other witness whose testimony might be called expert, or at least empirical, was Mr. Nicholas J. Kraus, one of the two contestants who successfully picked the titles predetermined by the puzzle experts in New York City for the entire eighty-four cartoons. He was thirty years old, lacked three months of finishing high school and had served in clerical positions with a bank and automobile company in St. Louis for nearly fifteen years. In other words, he had no special training in solving puzzles. The other winning contestant was Mrs. Eugene H. Hicks of St. Louis, who did not testify. The $10,000 first prize and the $2000 second prize were divided equally between these two. Kraus testified that toward the last of the contest he devoted at least three hours of an evening to each puzzle and all of Saturday and Sunday to some of them. He sent in two sets of answers, the second changing his first selection of titles for two or three of the cartoons—he could not remember which ones, but thought they were among the earlier ones.

After the contest was over the respondent sent out questionnaires to the 45,200 contestants who had completed it, containing three questions. Some 21,000 replies were received. The first question asked was how much time on the average the contestant had devoted to solving the more difficult puzzle cartoons. The answers showed the time varied from less than one-half hour to over five hours, there

being over 2000 of these latter. The second question sought the opinion of the contestants as to whether each of the cartoons had one title more dominant or appropriate than any other suggested. Over 17,000 replies were in the affirmative as against some 4000 in the negative. The third question inquired whether skill or guesswork was the more important factor in the contestant's selection of his answers. The answers of 968 contestants were "guesswork;" of 19,276, "skill;" and of 1099, "both." This evidence was strenuously objected to by the Attorney General on the ground that it was hearsay, not the best evidence, was opinion evidence from persons not qualified as experts, and invaded the province of the courts. The commissioner, though expressing doubt as to the admissibility of the questionnaires under the general rules of evidence, permitted the foregoing summary of the answers thereto to be introduced on the theory that it might be helpful in resolving the issues, and that this court must finally determine its competency and value.

Considering now as briefly as possible the testimony of the respondent's two expert witnesses on the six cartoons set out above. The successful contestant Kraus was asked why he had rejected the title Oregon and selected the designated title, Ginger Rogers, for cartoon No. 74. Referring to the cartoon it will be seen there is a fishing rod leaning against the wall, and there are three wooden blocks on the floor, one with the letter O on one side, one with the letter R and one with the letter E. In one of two glass jars on the floor is another block with the letter G on it. Also lying on the floor is a small pistol or "gun." This made five objects connecting with the word Oregon: O+R+E+G+gun. The correct title has only four: the G+in jar+rod+jars. Mr. Kraus' answer was that the letter O on the block wasn't very plain, and he "didn't think it was intended." But replying to a question as to what was wrong with the word Oregon for a title, he said "Not a thing." The respondent's puzzle expert, Mr. Gregory Hartswick, said this cartoon No. 74 was easy. He declared the title Oregon was hardly worthy of consideration "because the object on the floor is not a gun but a pistol, and a toy *gun* at that." Note that he, himself, used the word "gun," as we have italicized it. Respondent's brief says the title Ginger Rogers is the best and "most subtly suggested" one.

Cartoon No. 75 shows a man seated at a table by a window conveying to his mouth on a flat instrument, which may be a knife, some little round objects, which could be peas, beans, gooseberries or the like. Through the window is seen a motor truck backed up to the curb, with an ordinary box bed between the wheels and extending well above them. Attached to the bed are three hoops or ribs used to support a canvas cover, as on a covered wagon. The end gate of the truck is marked "2000 lbs." Among the suggested names

printed under the cartoon are Eton, Peter Lorre, Mary Eaton, Pearl Eaton, Doris Eaton. Many contestants chose the title Eton for the cartoon because the man is eating and the 2000 pounds marked on the truck make a ton, thus forming the combination eat+ton. But the title designated for the cartoon by the Publishers' Service Company was Peter Lorre, obtained by assuming the round objects being eaten are peas, and thus getting the combination Pea+eater+lorry (the latter meaning the automobile truck.)

Both the witnesses Kraus and Hartswick considered themselves fortunate in having special knowledge gained from military service during the World War that the motor truck was a "lorry." Webster's New International Dictionary (2 Ed.) Unabridged confines the meaning of the word, as applied to motor trucks, to those built along the lines of English lorries, which have a flat, low-rimmed platform slightly overhanging the four small heavy wheels. The Century Dictionary treats the word as referring only to low, nearly flat wagons. Wilcox's French-English Military Technical Dictionary does not give the word. Funk & Wagnall's New Standard Dictionary includes as one definition, "an automobile truck capable of transporting heavy loads." But as a one-ton truck could hardly be called one of heavy carrying capacity, it seems the motor truck in the cartoon does not come within any of these dictionary definitions.

Cartoon No. 79 was the subject of vigorous cross-examination in the hearing before the commissioner. It shows a little girl dragging a doll and crying. A pugnacious lad with an L on his sweater is hitting another youngster a vigorous blow and saying, "you leave 'er alone." At one side a bull dog seems about to open hostilities against a cat which is emitting a "ph-h-h." Included in the long list of names printed under the cartoon are three, Chancellor Dollfuss, Fritz Kreisler and Adolph Hitler, any one of which the relator says would be equally suitable as a title. The respondent's puzzle experts designated Adolph Hitler as the correct title. Substantially the same cartoon was used when the "Famous Names" contest was run by the Indianapolis Star. The name Fritz Kreisler was not printed under the cartoon in that contest, but the two others, Chancellor Dollfuss and Adolph Hitler, were. There the contest was judged by five distinguished citizens who selected Chancellor Dollfuss as the most appropriate title, against the recommendation of the Publisher's Service Company that Adolph Hitler be designated as the winning title just as it was in the instant contest.

To get the title Adolph Hitler the letter A must be supplied; it does not appear as a separate letter in the picture. So doing, the title is made up of (A)+doll+ph-h-h+hit+L+'er, five of these elements appearing in the picture. Chancellor Dollfuss would be derived from chance (outcome or evil chance of fight)+L+'er+doll+fuss, five

of these elements appearing in the cartoon and none being supplied. The respondent's expert Mr. Hartswick said: "I would say—this is pure opinion—that Adolph Hitler is the better because of the rather obscure meaning of chance, although the chance is there (referring to the Chancellor Dollfuss title)."

The much-mooted cartoon No. 80, shows a man tossing in the air a child holding a doll, and saying "and listen Ca-therine, this is the LAST time." The word Catherine is hyphenated as indicated, and the word last is drawn larger and heavier. On the floor are a jack in the box and a ball. The man, the child, the doll and the jack in the box all have their hands up. The winning title was Candle Light, made up from four elements in the cartoon: the hyphenated Ca+and+doll+light (implied from the tossed up child's light weight.) But the title The Last Round Up, chosen by 25 of the 33 contestants who failed only on that one cartoon, also had four elements from the picture: the+last (which latter was printed prominently)+round (the round ball)+up (from the fact that the hands of the man, child, doll and jack in the box were up.) The successful contestant, Kraus, said he picked the title Candle Light, rather than Hands Up and Last Round Up, which were in the list of suggested names published under the cartoon, because he thought it connected with the picture in more ways, and also because he regarded the hyphenating of the letters "Ca" in Catherine as significant, since he had noticed in the previous cartoons that such splitting of words had something to do with the puzzle. How could he tell that before the contest was over and the titles had been announced, we do not see. The expert, Mr. Hartswick, said he worked two days on this cartoon No. 80. He considered the title The Last Round Up as a possible title but finally discarded it, on the theory that there are three definite elements of the title Candle Light illustrated in the picture, Ca+and+doll; and only one element left to implication, the word light; whereas in the title The Last Round Up, there are only two definite elements, the+last, and the other two, round+up, must be implied. But with the hands and arms of the man, the little girl, the doll and the jack in the box all up, and the child herself up in the air, it is debatable whether the "up" is not a direct element; if it is an implication it is certainly much plainer than "light," and so is "round," from the shape of the ball.

Cartoon No. 81 shows a man pointing a gun at a can on a fence. Flying over the man's head is a jay bird. Near him is a little boy saying "That's the last bullet, pop." There is a church in the background and a pile of wood in the foreground. Essentially the same cartoon was used in the Indianapolis Star contest. There the title chosen was James Dunn, made up of J+aims+done (from the fact it was the last bullet.) In the Globe-Democrat contest the title

designated was James Kirkwood, viz., Jay+aims+Kirk(church)+ wood, and the little boy's remark and the title James Dunn was disregarded. But it should be stated that in the Indianapolis contest the name James Kirkwood was not printed in the list of names to choose from.

Cartoon No. 83 shows a man with knee exposed saying, "quick, Em-ma- get a doctor!" to a woman sitting at a table sewing. On the table are a teapot and cup. She is looking at, or seeing, the man's knee over or through her glasses. The room in which they are suggests the office of a small country inn. The winning title was Minnesota, obtained thus: Em(M)+inn+knee+sew+t(tea)+a. Another title in the published list chosen by a number of contestants was Gethsemane: Get+see+ma+knee. This title is no more farfetched than the title to cartoon No. 40 where Glad+its+George was taken as meaning *Gladys* George; and Cartoon No. 47 where a hoop of limburger cheese was treated as a symbol for *she's*. Gethsemane was deemed especially appropriate by some contestants because the man in the picture seems to be in pain—thus suggesting the Agony we associate with that garden. So much for a review of the cartoons.

I. The relator contends the "Famous Names" contest conducted by the respondent was a lottery or in the nature of a lottery. Section 10, Article XIV of the State Constitution provides:

"The General Assembly shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery, in this State; . . ."

Section 4314, Revised Statutes 1929 (Mo. Stat. Ann., p. 3002); provides:

"If any person shall make or establish, or aid or assist in making or establishing, any lottery, gift enterprise, policy or scheme of drawing in the nature of a lottery as a business or avocation in this state, or shall advertise or make public, or cause to be advertised or made public, by means of any newspaper, pamphlet, circular, or other written or printed notice thereof, printed or circulated in this state, any such lottery, gift enterprise, policy or scheme or drawing in the nature of a lottery, whether the same is being or is to be conducted, held or drawn within or without this state, he shall be deemed guilty of a felony. . . ."

It will be noted both the Constitution and statute prohibit any scheme in the nature of a lottery; and it has been several times held that within their meaning and intent a lottery includes every scheme or device whereby anything of value is for a consideration allotted by chance. [State v. Emerson, 318 Mo. 633, 639, 1 S. W. (2d) 109, 111.] The word has no technical meaning in our law. Lotteries are judicially denounced as especially vicious, in comparison with other

forms of gambling, because by their very nature they are public and pestilentially infect the whole community. They prey upon the credulity of the unwary and widely arouse and appeal to the gambling instinct. [State v. Schwemler, 154 Ore. 533, 60 Pac. (2d) 938; State ex rel. Home Planners Depository v. Hughes, 299 Mo. 529, 537, 253 S. W. 229, 231, 28 A. L. R. 1305, 1310; State v. Becker, 248 Mo. 555, 562, 154 S. W. 769, 771.]

The elements of a lottery are: (1) consideration; (2) prize; (3) chance. It is conceded that the first two of these were present in the "Famous Names" contest, here involved, the sole question being whether the third element—chance—was there. In England and Canada where the "pure chance doctrine" prevails a game or contest is not a lottery even though the entrants pay a consideration for the chance to win a prize, unless the result depends *entirely* upon chance. In the United States the rule was the same until about 1904; but it is now generally held that chance need be only the *dominant* factor. [38 C. J., sec. 5, p. 291; 17 R. C. L., sec. 10, p. 1223; Waite v. Press Publishing Assn., 155 Fed. 58, 85 C. C. A. 576, 11 L. R. A. (N. S.) 609, 12 Ann. Cas. 319.] Hence a contest may be a lottery even though skill, judgment or research enter thereinto in some degree, if chance in a larger degree determine the result. Whether the chance factor is dominant or subordinate is often a troublesome question.

It is pretty well settled in this country now that the element of chance inheres in guessing contests so far as to make them a lottery. It was so held in Hudelson v. State (1883), 94 Ind. 426, 48 Am. Rep. 171, where the contest was to guess nearest to the number of beans in a glass globe. The case conceded an expert mathematician might, more nearly than an uneducated person, compute the size of the globe and the number of beans therein; but held there were inescapable elements of chance, due to the unknown thickness of the glass in the globe and the unknown size of the beans hidden from view, which made an exact estimate impossible. A contrary conclusion was reached in two similar Canadian cases: Reg. v. Dodds, 4 Ont. Rep. 390, and Reg. v. Jamieson, 7 Ont. Rep. 149.

So, also, where prizes were to be awarded to those making the closest estimate of the number of cigars on which the United States would collect a stamp tax during a specified month, the contest was held to be a lottery in People ex rel. Ellison v. Lavin (1904), 179 N. Y. 164, 71 N. E. 753, 66 L. R. A. 601, 1 Ann. Cas. 165. And the same was ruled of guessing contests on the popular vote in an election, in Stevens v. Times-Star (1905), 72 Ohio St. 112, 150, 73 N. E. 1058, 1061, 106 Am. St. Rep. 586, 593, and Waite v. Press Publishing Assn., supra (1907), 155 Fed. 58, 11 L. R. A. (N. S.) 609, 12 Ann. Cas. 319. Especial consideration should be given to

the holdings in these cases concerning the degree or extent to which chance must operate, and on whom.

The Stevens and the Waite cases, the latter quoting the former, both say: "It is true that one acquainted with the results of the elections of the State in previous years and educated in politics would have some advantages over one ignorant in those respects, yet it must be apparent even to a casual observer, that the result would depend upon so many uncertain and unascertainable causes, that the estimate of the most learned would be after all nothing more than a random and undecisive judgment. In the sense above indicated there is an element of skill, possibly certainty, involved; but it is clear that the controlling, predominating element is mere chance."

In the Lavin case the New York Court of Appeals said: "If the contest for a prize was to be had among experts, the award of the prize, despite the many elements affecting the result which no one could foresee, might possibly be held dependent on judgment and not on chance. But the competition before us is not at all of that character. The scheme contemplates over 35,000 competitors." The opinion then points to the great variance in the number of cigars stamped by the Government from month to month, and says that even if experts could estimate within one per cent the enormously large number which would be stamped during the specified future month they might miss it by as much as 5,000,000. It then continues: "Yet, with 35,000 competitors the probabilities are overwhelming that the first prize will be won by a very much closer approximation. If the difference between the estimate which won the first prize and that which secured the second prize should be only 10,000 or even only a 100,000, would anyone deny that the result occurred through 'pure chance' as defined, and that it did not proceed from the possession of superior information or the exercise of greater judgment or skill?"

Laying the foregoing cases aside for a minute, let us look at a few of the decisions cited by respondent which may be thought to face the other way. In Brooklyn Daily Eagle v. Voorhies (1910), 181 Fed. 579, it was held a contest for a prize for the "best" essay upon the name of a certain breakfast food was not a lottery, and that advertisements thereof could be sent through the United States mail. The defendant postmaster contended the conditions of the contest did not specify in what respect the essays should be "best" and therefore left it open to the whim of the judges—or chance. The opinion said, "it must be held that to offer a prize for the 'best' essay might be a lottery, if the persons are not induced to compete with some definite statement of what the word 'best' means;" but ruled that sufficient appeared in the record to show definitely the contest was to be judged on the basis of literary merit for advertising purposes.

In Eastman v. Armstrong-Byrd Music Co. (1914), 212 Fed. 662, 52 L. R. A. (N. S.) 108, prizes were offered for the *neatest* correct solutions of the "fifteen problem." The problem was to insert the digits 1 to 9 in the 9 subdivisions of a square so that they would add up to 15 vertically, horizontally and diagonally. The opinion said: "While it is true that, if the scheme be a lottery, gift enterprise, or similar scheme, it is not necessary that it shall be determined wholly by chance, but if it rests upon a determination in whole or in part by chance it is sufficient, yet it must be first a lottery, gift enterprise, or similar scheme, and even then the word 'chance' is not used in its broadest signification." The case then ruled the word chance in the law forbidding lotteries must be construed with the word lot and does not apply to an award of prizes based on the affirmative, conscious act and will of the contestants. On this theory the contest was held not to be a lottery. As to the requirement that the winning solutions be the *neatest* the decision said: "The fact, if it be a fact, that the judges misapprehended the technical meaning of the word 'neatness' would not convert into a lottery that which had no resemblance to a lottery."

There are also several cases dealing with a so-called "advertoshare" game sold to merchants. It consisted of a punch board with 300 or more holes, each containing a small slip of paper with a code word printed thereon which referred to some one of ten partly played checker games. A player paid ten cents to punch the board and if he succeeded in winning the checker game called for by the slip of paper he drew, he was to receive a box of candy. He received credit for the ten cents on the price of a box of the candy even though he failed to win. All of the problems could be solved by a skillful checker player but some were more difficult than others, and therefore there was a certain element of chance in which problem the player drew. But it was held that skill was the predominant element in the contest, and that it was not a lottery. [See D'Orio v. Startup Candy Co., 71 Utah, 410, 266 Pac. 1037, 60 A. L. R. 338; D'Orio v. Jacobs, 151 Wash. 297, 275 Pac. 563; Johnson v. McDonald, 132 Ore. 622, 287 Pac. 220; Boatwright v. State, 118 Tex. Cr. Rep. 381, 38 S. W. (2d) 87.]

This brings us to several decisions in which the facts were closely similar to those in the case at bar. In Barclay v. Pearson (1893), 2 Ch. 154, Pearsons Weekly invited contestants to pay one shilling each to create a fund which would be equally divided among such of them as should guess a word omitted from a given paragraph or sentence in said periodical. The missing word had been predetermined and placed under seal with a third party. The Chancery Division of the Supreme Court of Judicature held the contest a lottery. The opinion conceded that if the contest had been to supply

the *most appropriate* word it would have been different; but that since no method was prescribed for determining the winning word and the matter was left to arbitrary selection, the contest was governed entirely by chance, not skill.

In Scott v. Director of Public Prosecutions (1914), 2 K. B. 868, 876, the Sunday Chronicle of London offered prizes to the winners of a contest wherein the contestants were to choose one word from a prescribed list of forty-two and to suggest two or three words having some bearing on the meaning of the chosen word, each of which should begin with a different letter appearing in the chosen word. The winner selected the word undertaking and his answer was "Undertaking: Terminates doctor's experiments." The Solicitor-General maintained the contest was a lottery because it set no standard of genuine literary merit by which it should be judged. The leading opinion by LUSH, J., held it made no difference whether the literary standard of the contest was high or low; that while the answers of the contestants appealed only to the taste or fancy of the judges, and in that sense introduced an element of chance, still that did not "make the adjudication a mere determination by chance and nothing but chance." Further the opinion said: "a decision according to honest taste or fancy is not a decision by chance and nothing else, however justly one may belittle the class or degree of merit." It will be noted this decision was based on the pure chance theory. And it was rendered with some expressions of regret; the leading opinion just reviewed, acknowledges the consequences of such competitions are mischievous and says the English statute was enacted nearly 100 years earlier before newspapers circulated so widely. CHANNELL, J., reluctantly concurred in the result, and said the contest seemed to him within the mischief of the Lottery Act.

Hoff v. Daily Graphic (1928), 132 Misc. Rep. 597, 230 N. Y. Supp. 360, dealt with a "Graphic Movie Title Contest." A catalogue was issued to the public for twenty-five cents containing the rules and regulations of the contest, together with 6000 titles of movie plays. Daily for seventy-two days the newspaper published a cartoon or drawing with a coupon attached. Contestants were to select from the catalogue list movie titles deemed most appropriate to the cartoons, and the best lists, as determined by a committee of impartial judges, were awarded prizes, the highest being a $20,000 model home. The New York Supreme Court overruled a motion to dismiss, holding that on the face of the complaint the contest was not a lottery. The opinion says: "The allegations in the complaint clearly indicate the exercise of judgment and taste in the selection of titles, both by the contestant and by the judges, and while taste is to a certain extent individual, and perhaps at times fanciful, nevertheless the exercise of it is far removed from blind guesswork or chance."

In support of that view the opinion quotes the part of Scott v. Director of Public Prosecutions, supra, 2 K. B. 1. c. 876, 877, holding a decision according to honest taste or fancy is not a decision by chance and nothing else. It adds that the contest in judgment appealed not only to taste but to skill, but holds that in the trial on the merits an effort may be made to show the appeal to skill and merit was a mere cloak to cover up the true nature of the scheme. This Hoff case seems to be ruled on the English pure chance theory.

In Coles v. Odhams Press, Ltd. (1936), 1 K. B. 416, a newspaper conducted a ''Great Cross-word Offer'' and agreed to award a prize of 2000 pounds for the correct or nearest correct solution of the puzzle. As to most of the spaces in the puzzle the correct word, suggested by the clues printed therewith, was fairly obvious and had no alternative; but as to some of them any of two or more words would fit into the space and to that extent were alternatives. The competition editor had prepared his controlling solution in advance. The informant contended that because equally appropriate words would fit into some of the spaces the contest became a mere matter of guessing which of these the contest editor had chosen; and that it was therefore a lottery notwithstanding skill would lead to the correct choice of words for most of the spaces. The defendants maintained that skill and ingenuity were required in discovering and selecting the proper alternative words; that the so-called alternatives were not really alternatives, because in every instance some one word was more appropriate than any other.

The magistrate below had held the contest was not a lottery. Of his findings the decision says: ''The magistrate found as a fact that in the greater number of cases the words chosen were the best and most appropriate, having regard to the clues, but that it was doubtful whether certain of the other words chosen were the most appropriate and had the best relation to the clues and that in the case of some of them the alternative word was better; but he was of opinion that the competition must be looked at as a whole, and that he was not justified in dividing the question into what counsel for the prosecution had described as two classes of words—namely, 'easy words' and 'difficult words,' and he found as a fact that a considerable element of skill was required to solve the puzzle (as a whole) and that the people who had successfully solved it had exercised a substantial degree of skill; and on these grounds he dismissed all the summonses.'' (Parenthesis ours.)

The Kings Bench Division reversed the magistrate, the principal opinion by Lord HEWART, C. J., saying: ''The magistrate has thought fit to find that this competition involved and contemplated a degree of skill. But skill about what? The element of skill, if any, is, in my opinion, to be directed, and directed only, to the lucky guessing

of the details of a mysterious collection of unrelated words, selected beforehand by a person whose idiosyncrasies are as completely concealed as his methods, and whose ignorance may be coextensive with the wisdom of Solomon. I see the word 'lottery' written all over this scheme, and it passes my comprehension to understand how the magistrate could have come to the conclusion to which he came.''

The concurring opinion of HUMPHREYS, J., speaking of Scott v. Director of Public Prosecutions, supra, decided twenty-two years earlier, said: ''If, with the knowledge gained from cases which have been decided since that case, the learned judges who decided that case were able to deal with the matter again, they might come now to a different conclusion.'' It then continued: ''But I think it is impossible to say, on the findings of the magistrate in this case, that the only possible solution, or, in other words, the necessarily correct solution, of this puzzle is that which the competition editor put forward as his solution and which was published in the newspaper as the correct solution. . . . When there are alternative solutions of such a puzzle as this the difficulty arises that the competitor who is the person to be considered, is invited to decide which of two or more alternative solutions will be selected by some person whom he does not know, and by some method which is not indicated.''

Finally in People v. Rehm (1936), 13 Cal. App. (2d) 755, 57 Pac. (2d) 238, a contest substantially like the present one was adjudicated. Cartoons were printed in a newspaper with a list of suggested titles and the contestants were to select therefrom the best or most appropriate title. The first prize was $25,000. The California Court of Appeals held the contest was a lottery ''because the elements of a bona fide contest of skill are not present.'' The main opinion, by BISHOP, J., held: ''Under each cartoon several titles, each one as apt to be given first place as any other one, because it, as the others, embodies one or more of the many ideas scattered around in the cartoon. There is no standard by which one title can be said to be either 'best' or 'more appropriate' than all others. It follows that some one of the many contestants will receive first prize, his selection depending not on his skill in picking titles, but upon the chance that the six he selected happened to be also the six that the judges selected.''

The concurring opinion of SHAW, J., declared: ''Each cartoon depicts a mere congeries of objects, combined for no apparent purpose other than that each may serve as a clue to which one or more of the titles suggested below may be connected. If there is any opportunity at all for the exercise of skill or judgment in selecting a set of titles for the cartoons from those suggested, it is clearly but slight, and the agreement of one person's selection with that of another must depend mainly on chance.'' SCHAUER, J., in a concurring

opinion said he was "not prepared to hold that some one title in each instance may not rationally be shown to be most appropriate of all;" but that the evidence warranted a conclusion that the contest was understood to be a lottery, and therefore a subterfuge.

This tedious review of the cases shows the ingenuity with which efforts have been made to circumvent lottery laws by devising contests for a consideration which purport to be and in some degree actually are contests of skill, although their obvious, intended and widely disseminated appeal is to chance—to the hope of winning by shrewd and lucky guessing disproportionately more than the contestant has put into the enterprise. These schemes have always been branded as mischievous. Indeed, an oft-quoted statement from Long v. State, 74 Md. 565, 570, 22 Atl. 4, 12 L. R. A. 425, 28 Am. St. Rep. 268, is that "it is very difficult, if not impossible, for the most ingenious and subtle mind to devise any scheme or plan, short of a gratuitous distribution of property, which has not been held by the courts of this country to be in violation of the lottery or gaming laws in force in the various States of the Union." Without going that far, it is safe to say that for the public good such schemes should be scanned by the courts with a scrutinous eye.

It is impossible to harmonize all the cases. But we draw the conclusion from them that where a contest is multiple or serial, and requires the solution of a number of problems to win the prize, the fact that skill alone will bring contestants to a correct solution of a greater part of the problems does not make the contest any the less a lottery if chance enters into the solution of another lesser part of the problems and thereby proximately influences the final result. In other words, the rule that chance must be the *dominant* factor is to be taken in a qualitative or causative sense rather than in a quantitative sense. This was directly decided in Coles v. Odhams Press, Ltd., supra, when it was held the question was not to be determined on the basis of the mere proportions of skill and chance entering in the contest as a whole.

The same thought is reflected in Eastman v. Armstrong-Byrd Music Co., supra, where it was stated that if a contest "rests upon a determination in whole or in part by chance" it is a lottery; and in Commonwealth v. Theater Advertising Co., 286 Mass. 405, 410, 190 N. E. 518, 520, which proceeds on the theory that the true inquiry is whether chance *inheres* in the contest, or whether it is merely *incidental;* and in Horner v. United States, 147 U. S. 449, 459, 37 L. Ed. 237, 13 Sup. Ct. 409, where a scheme for selling bonds was held a lottery because "the element of certainty goes hand in hand with the element of lot or chance, and the former does not destroy the existence or effect of the latter." In the instant case it stands conceded that at the beginning of the "Famous Names" contest the cartoons were

comparatively simple and the list of suggested titles was short. This made the contest inviting to entrants. But toward the end the cartoons became more "subtle" and as many as 180 titles had to be considered. It was a weeding out process, undoubtedly; and if chance inhered in the solution of these latter cartoons, though only a few of them, and eliminated a large number of contestants, then it must be said the result was influenced by chance.

Further, we are convinced the question whether the element of chance was present must be viewed from the standpoint of the nearly 70,000 persons who entered the contest in response to the advertising thereof; and that it is not to be measured by any absolute or technical standards. As was said in Coles v. Odhams Press, Ltd., supra, "the competitor is the person to be considered." In the instant case the public was informed that anyone might win; that no special skill, training or education was required; and that an opportunity was offered to gain some "easy money." It is true reference to the possibility of children's winning was omitted from the later advertising, but aside from that hope was held out to the general public. That being true, whether chance or skill was the determining factor in the contest must depend upon the capacity of the general public—not experts—to solve the problems presented.

The respondent's theory is that the interpretation of rebus puzzles is a science; and that since they can be solved by the application of these scientific principles the element of chance is absent. Some of the decisions lend support to that view, such as Hudelson v. State, supra, Stevens v. Times-Star, supra, and Waite v. Press Publishing Assn., supra. All of these cases conceded an expert might more nearly than a nonexpert approach a solution of the problems they were considering, and then swept away that concession by saying that nevertheless there remained unfathomable elements in the problems which nobody could solve. This might be taken to mean that if contest problems can be solved at all, chance is eliminated. And the "advertoshare" checker game cases seem to partake of that theory, though there is possibly an allowable distinction there.

But such is not the true general rule. As was said in People ex rel. Ellison v. Lavin, supra, if a contest were solely between experts possibly elements affecting the result which no one could foresee might be held dependent upon judgment; but not so when the contest is unrestricted. What is a matter of chance for one man may not be for another. And as Mr. Justice HOLMES said in Dillingham v. McLaughlin, 264 U. S. 370, 373, 68 L. Ed. 742, 44 Sup. Ct. 362, "what a man does not know and cannot find out is chance as to him, and is recognized as chance by the law." Obviously, if some abstruse problem comparable to the Einstein theory were submitted to the general public in a prize contest on the representation that no special

training or education would be required to solve it, the contention could not be made, after contestants had been induced to part with their entrance money, that the element of chance was absent because there were a few persons in the world who possessed the learning necessary to understand it.

Now, as regards the cartoons to be labeled in the ''Famous Names'' contest. Without further discussion it is evident that an element of chance inhered in some of them—of guessing what titles had been selected by the creators. They had in mind a title for each cartoon before it was drawn, but they also introduced foreign elements in the later ones to make them more confusing or subtle. There were no fixed rules by which these cartoons could be solved by the rank and file of contestants. The respondent's witness Mr. Gregory Hartswick, who was an expert and had been drawing puzzles for fifteen years, worked two days before he solved cartoon No. 80. Thirty-three out of the thirty-six contestants who made only one error were eliminated by this one cartoon, and twenty-five of these gave the same wrong answer. Mr. Hartswick said it was pure opinion with him that the designated title for Cartoon No. 79, Adolph Hitler, was better than Chancellor Dollfuss. The fact that out of more than 45,000 contestants only two gave correct answers to the entire eighty-four cartoons proves their solution was not a matter of skill and judgment, and that chance did have a proximate effect on the final result. And the circumstance that the two winners, Mr. Kraus and Mrs. Hicks, were not experts does not establish the contrary; indeed, it indicates the contest in its final analysis was controlled by chance. We think it was a lottery.

But even so, we are equally convinced that the facts call for no drastic action against the respondent. Through its officers it acted in good faith. When the contest was in contemplation a clearance from the Post Office Department was first obtained. When objections were made, the character of its advertising and the method of judging the contest were changed; and it endeavored to eliminate ambiguity from the cartoons. The contest had run sixty-four of the eighty-four days before the Attorney General definitely ruled that it was a lottery. The respondent then proceeded only after it had been advised by three able law firms in St. Louis that it might legally do so. The purpose of the contest was legitimate—to promote reader interest in its newspaper. There was no fraudulent or criminal intent. The law in various jurisdictions is conflicting and confusing. Since May, 1935, thirty similar contests had been run in twenty-one other newspapers in the United States without Federal or State interference.

It would be unreasonable and unjust to issue a write of ouster in this case. In circumstances no more extenuating this court in State ex inf. Miller v. St. Louis Union Trust Co., 335 Mo. 845, 872, 74

S. W. (2d) 348, 361, assessed a fine of one dollar and taxed the costs against the respondent. That will be the order here. It is ordered and adjudged that the respondent pay a fine of one dollar and that the costs be taxed against it. All concur.