[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 357 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 358 
The State of Alabama appeals from an adverse judgment of the Mobile Circuit Court on its declaratory-judgment claims in a proceeding below. The circuit court ruled that (1) § 13A-12-76, Ala. Code 1975, protects from the prohibitions of §§ 13A-12-20
through -75, Ala. Code 1975 (hereinafter referred to as the "criminal gambling statutes"), video-game machines whose outcomes are dependent at least "in part" upon the skill of the player, or that, by application of merely "some skill," entitle the player to a reward, and (2) to the extent § 13A-12-76 purports to legalize machines that involve only "some skill," that section does not contravene the ban on lotteries and schemes in the nature of lotteries found in § 65 of Alabama's Constitution. We reverse.
 I. Procedural History
In September 1998, the State, on the relation of John M. Tyson, Jr., as District Attorney of Mobile County, filed a complaint seeking the forfeiture of 20 video-game machines, currency, and documents law-enforcement officers had seized from nine stores located in Mobile County, including Myers Country Store, Satsuma Chevron, Starvin Marvin # 2, Starvin Marvin # 3, Papa Joe's, Theodore Conoco, Bubba's Citgo, Superstop, and Ike's. Ted's Game Enterprises ("Ted's"), which owned and had distributed the seized machines, and each of the aforementioned stores were served with the State's complaint. The State alleged that the seized machines were "slot machines and video gambling devices, paraphernalia, currency and records," which, pursuant to the criminal gambling statutes, were contraband and were used and intended for use in unlawful gambling activity. The State requested that the seized machines, currency, and documents be condemned and that they be awarded to the State pursuant to Ala. Code 1975, §13A-12-30.[1]
On March 17, 1999, the State filed an "Amended Complaint." Among other things, the State sought in this amended complaint a judgment declaring that the machines owned and distributed by Ted's are illegal "slot machines" and "gambling devices" under Alabama's criminal gambling statutes and that they are not "bona fide coin-operated amusement machines" protected by § 13A-12-76
from the prohibitions of those gambling statutes. Nine days later, on March 26, 1999, the State also filed a motion to dismiss without prejudice its original forfeiture claim as to 12 of the seized machines, explaining that those 12 machines had been returned to *Page 359 
Ted's. On May 13, 1999, the State withdrew this motion and instead filed a notice of voluntary dismissal under Rule 41(a), Ala. R. Civ. P. On that same day, the trial court signed an entry on the case action summary sheet acknowledging that the State had voluntary dismissed its forfeiture claims as to the 12 machines, but that it had not dismissed its declaratory-judgment action.[2]
On September 27, 1999, the State filed its "Second Amended Complaint." The second amended complaint included the claims set out in the State's first amended complaint, but added a new claim seeking a declaratory judgment as to the constitutionality of §13A-12-76 in relation to Alabama Constitution 1901, Art. IV, §65. The State also alleged:
 "3. [Ted's] ha[s] distributed the machines at issue and other such machines throughout Mobile County[3] in violation of the provisions of Alabama Code Section 13A-12-20 through 13A-12-76.
 "4. The [State] seeks to enforce the provisions of Alabama Code Section 13A-12-20 through 13A-12-76.
 "5. The [State] claims a real and substantial justiciable controversy exists as set forth above and requests a judgment concerning the interpretation of the statute, the rights, and legal relations of the parties and a decision by this court will serve the public interest."
The State requested that the trial court "declare the rights, duties and liabilities of the parties" and enter "such orders, [and] judgments . . . as may be necessary and proper to give effect to the parties' respective rights under Alabama Code Section 13A-12-20 through 13A-12-76."
Ted's and Bubba's Citgo filed a joint answer to the State's amended complaint, asserting, among other things, the defenses of res judicata and collateral estoppel, based in part upon the decision of the Montgomery Circuit Court in State v. Ray Ann'sPlace, CV-98-325 (January 11, 1999), affirmed without opinion,State v. Ray Ann's Place (No. 2980541), 789 So.2d 248
(Ala.Civ.App. 1999) (table), and upon several other forfeiture cases the State had allegedly unsuccessfully prosecuted *Page 360 
in Montgomery County and Lawrence County with respect to machines owned and distributed by Ted's. Ted's and Bubba's Citgo also filed a joint motion for a summary judgment and joint motions for a judgment as a matter of law, asserting, in pertinent part, the defenses of res judicata and collateral estoppel. The trial court denied the motions.
On October 6, 2000, after a hearing on the merits, the trial court agreed with Ted's and found that, even though skill may be a "minor factor," machines "`the result of whose operation depends in whole or in part upon the skill of the player' and `which, by application of some skill,' entitle the player to some reward are" protected by § 13A-12-76 from the prohibitions in Alabama's criminal gambling statutes. The trial court further concluded that machines protected as "bona fide coin-operated amusement machines" under § 13A-12-76, by definition, are not "slot machines" under § 13A-12-20.
Despite the foregoing findings, the trial court also determined that the eight machines seized from Ted's that were still in the State's possession offered rewards exceeding the statutory limit in § 13A-12-76 of $5 on a single play and that, for this reason alone, they were illegal gambling devices not protected by §13A-12-76 and were subject to forfeiture. In its judgment, the trial court also stated that it could not reach the broader issue of whether § 13A-12-76 was unconstitutional because, the court said, the State had failed to include that issue in its complaint and had failed to serve the attorney general with a copy of the complaint in accordance with Ala. Code 1975, § 6-6-227.
The State filed a motion bringing to the trial court's attention the fact that it had in fact filed a "Second Amended Complaint" that requested a declaratory judgment as to the constitutionality of § 13A-12-76. The motion included appropriate attachments reflecting the fact that the attorney general had, in fact, been served with a copy of the State's second amended complaint.[4]
On November 22, 2000, the trial court amended its judgment, noting that the State had properly sought a declaratory judgment as to the constitutionality of § 13A-12-76. The trial court addressed that claim by quoting from Opinion of the Justices No.358, 692 So.2d 107, 112 (Ala. 1997):
 "[A]s long as some degree of skill is required in a gambling activity, that activity differs from a lottery in kind, rather than in degree. In such a case, the issue is not the degree of skill involved, but whether some skill is involved."
On that basis, the trial court entered a final judgment in which, among other things, it held that § 13A-12-76 did not authorize the operation of a lottery and was "not unconstitutional for that reason."
On the same day the trial court entered its final judgment, the State filed a postjudgment motion. The trial court denied the State's postjudgment motion on December 20, 2000, and the State filed a notice of appeal to this court on January 18, 2001.
 II. Preliminary Issues
Before addressing the merits of the State's arguments, we first address several preliminary issues raised by Ted's. Ted's argues that we should dismiss the State's *Page 361 
appeal because, it says, the appeal was untimely and because the State lacks standing to pursue this appeal. Ted's also argues as a preliminary matter that the State's claims that Ted's machines are prohibited by the criminal gambling statutes and that §13A-12-76 is unconstitutional are barred by the doctrines of res judicata and collateral estoppel.
Ted's argument that the State's appeal was untimely is based upon its conclusion that the trial court's October 6, 2000, order was a final judgment and that the State's subsequent motion asking the trial court for a ruling on its declaratory-judgment claim as to the unconstitutionality of § 13A-12-76 was a postjudgment motion. Ted's argues that the motion filed by the State on November 22, 2000, was therefore an attempt to file asecond postjudgment motion and was void.
It is clear from the terms of the trial court's October 6, 2000, order that that order did not rule on all of the State's claims. "Where an action involves multiple claims or parties, any adjudication that adjudges fewer than all of the claims or parties is interlocutory, absent a Rule 54(b)[, Ala. R. Civ. P.,] order determining that there is no just reason for delay and expressly directing the entry of a judgment." McGlothlin v.First Alabama Bank, 599 So.2d 1137, 1140 (Ala. 1992); see also
Rule 54, Ala. R. Civ. P. Absent a Rule 54(b) certification, an adjudication of only some of the claims involved in an action is not a final judgment from which an appeal can be taken. See,e.g., McGlothlin, 599 So.2d at 1140.
The trial court did not adjudicate all of the State's claims until it entered its November 22, 2000, judgment and the time for the State to file its appeal did not begin to run until that judgment was entered. After the trial court entered its final judgment on November 22, 2000, the State timely filed an appropriate postjudgment motion and, within 42 days of the date that the trial court denied that postjudgment motion, filed its notice of appeal. See Rule 59, Ala. R. Civ. P.; Rule 4, Ala. R.App. P. The State's appeal in this matter is therefore timely.
Ted's next argues that, for two reasons, the State lacks standing to pursue this appeal. First, Ted's states in a footnote in its brief to this Court that "it does not affirmatively appear that the State is a `person' under the Declaratory Judgment Act entitled to assert this action. Ala. Code [1975,] §§ 6-6-220, 6-6-223."
Ted's cites no authority, however, to indicate that the Legislature did not intend that the State, like other persons, could avail itself, in an appropriate case, of the remedies afforded by the Declaratory Judgment Act. We note that other jurisdictions that have adopted the Uniform Declaratory Judgment Act have construed the term "person" to include the State. See,e.g., State v. General American Life Ins. Co., 132 Neb. 520,272 N.W. 555 (1937); see also, 26 C.J.S., Declaratory Judgments, §§ 133-34, pp. 225-28 (2001) (noting that a state, a political subdivision of a state, the attorney general of the state, and other state officers and county officers may generally file an action for declaratory relief).
"To enforce its rights or redress its wrongs, as a political corporation, a state may ordinarily avail itself of any remedy or form of action which would be open to a private suitor under similar circumstances." Ex parte State ex rel. AttorneyGeneral, 245 Ala. 193, 195, 16 So.2d 187, 188 (1943); see also
Ala. Code 1975, § 6-5-1(a) ("The state may commence an action in its own name and is entitled to all remedies provided for the enforcement of rights between individuals without giving *Page 362 
bond or security or causing an affidavit to be made, though the same may be required as if the action were between private citizens."); Consolidated Indem. Ins. Co. v. Texas Co.,224 Ala. 349, 140 So. 566 (1932).
The purpose of the Declaratory Judgment Act "is to settle and to afford relief from uncertainty and insecurity with respect
to rights, status, and other legal relations and is to be liberally construed and administered." Ala. Code 1975, § 6-6-221;see also Thompson v. Chilton County, 236 Ala. 142, 144,181 So. 701, 703 (1938) ("the Declaratory Judgment Act was designed to supply the needs of a form of action that will set controversies at rest before they lead to repudiation of obligations, theinvasion of rights, and the commissions of wrongs" (emphasis added)). In light of the invasive power the State wields when it seeks to enforce statutory provisions against its citizens, the State's right to seek a declaratory judgment with respect to matters such as those at issue here appears to be particularly appropriate.
Second, Ted's argues that the State does not have standing to pursue this appeal because the State succeeded on its forfeiture claim and therefore, according to Ted's, was the prevailing party before the trial court. Ted's cites the general rule that a prevailing party does not have standing to appeal, except as to the adequacy of damages. See, e.g., Ex parte Moebes,709 So.2d 477, 478 (Ala. 1997).
In addition to its forfeiture claim, however, the State brought separate claims requesting a judgment declaring whether "slot machines" and "gambling devices" are protected from Alabama's criminal gambling statutes by § 13A-12-76 and declaring that §13A-12-76, to the extent it purports to legalize games whose outcomes depend on the exercise of merely "some skill," contravenes § 65, Ala. Const. of 1901. Not only did the trial court not grant the State relief on these declaratory-judgment claims, it held that the law in Alabama was the opposite of what the State contended. Accordingly, the State was not a prevailing party as to its declaratory-judgment claims and thus has standing to pursue this appeal. See Personnel Bd. of Jefferson County v.Bailey, 475 So.2d 863, 866 (Ala.Civ.App. 1985) ("our courts have recognized that where a judgment is not wholly in a party's favor and contains adverse rulings prejudicial to a party, such party has a right to appeal"); see also Forney v. Apfel,524 U.S. 266, 271, 118 S.Ct. 1984, 141 L.Ed.2d 269 (1998) ("this Court . . . has clearly stated that a party is `aggrieved' and ordinarily can appeal a decision `granting in part and denying in part the remedy requested'" (quoting United States v.Jose, 519 U.S. 54, 56, 117 S.Ct. 463, 136 L.Ed.2d 364
(1996))); 4 C.J.S., Appeal Error, § 169, pp. 239-42 (1993).[5] *Page 363 
Ted's next argues that the State's declaratory-judgment claims are barred by the doctrine of res judicata, or claim preclusion, and by the doctrine of collateral estoppel, or issue preclusion. We first address the issue of res judicata.
In Dairyland Insurance Co. v. Jackson, 566 So.2d 723 (Ala. 1990), our Supreme Court stated:
 "The elements of res judicata, or claim preclusion, are (1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both suits."
566 So.2d at 725. Ted's contends that the decision of the Montgomery Circuit Court in State v. Ray Ann's Place[6]
and in five other actions brought by the State in the Montgomery Circuit Court and the decision of the Lawrence Circuit Court in a case brought by the State against various parties constitute bases for the application of the doctrine of res judicata in the present case.
Ted's was not a party in Ray Ann's Place; therefore that case does not satisfy the third element of res judicata. Moreover, the fourth element of res judicata (the "same cause of action") is not met with respect to any of the cases Ted's cites. Each of those cases involved only in rem actions for the forfeiture of the machines and the currency at issue therein. In contrast, the present case involves a request by the State for an in personam declaratory judgment as to the proper construction and application of various gambling-related statutes and the constitutionality of one of those statutes. Such issues were not comprehended by the cases cited to us by Ted's. The State's declaratory-judgment claims, therefore, are not barred by the doctrine of res judicata.
Ted's also argues that the doctrine of collateral estoppel prevents the State from pursuing its declaratory-judgment claims against Ted's.
 "Collateral estoppel operates where [a] subsequent suit between the same parties is not on the same cause of action. Requirements for collateral estoppel to operate are (1) issue identical to one involved in previous suit; (2) issue actually litigated in prior action; and (3) resolution of the issue was necessary to the prior judgment. If these elements are present, the prior judgment is conclusive as to those issues actually determined in the prior suit."
Wheeler v. First Alabama Bank, 364 So.2d 1190, 1199 (Ala. 1978) (citation omitted; emphasis added).
We first note that Ted's does not argue, and the record contains no evidence indicating, that the constitutionality of §13A-12-76 was "actually litigated" in any prior action. We therefore hold that the doctrine of collateral estoppel does not apply to prevent consideration of that issue in the present case.
Ted's does argue, however, that the doctrine of collateral estoppel prevents consideration in the present case of the statutory issue, i.e., how to construe and reconcile the criminal gambling statutes and § 13A-12-76. Specifically, Ted's argues that the doctrine of collateral estoppel prevents the *Page 364 
State from arguing, as a matter of statutory construction, that §13A-12-76 does not operate to legalize machines that fall within the definitions of "gambling devices" and "slot machines" in §13A-12-20. As discussed further below, see Part III, the statutory-construction issue thus presented may be framed as a choice between two competing propositions of law: either (a) §13A-12-76 protects games involving at least "some skill" from Alabama's criminal gambling statutes, or (b) although certain provisions within § 13A-12-76 at first glance appear to legalize games involving only "some skill," § 13A-12-76(e)(2) and other aspects of § 13A-12-76 operate to prevent § 13A-12-76 from actually legalizing games that fall within the definitions in §13A-12-20 of "gambling devices" and "slot machines."
The issue presented is not the manner in which some well-established or accepted rule of law is to be applied to some set of facts that are the same as or substantially similar to the facts presented in an earlier case. Rather, at issue is a pure question of law involving how various provisions of § 13A-12-76
should be interpreted and how those provisions relate to §13A-12-20 and the other criminal gambling statutes.
There is ample authority for the proposition that pure questions of law are not subject to the doctrine of collateral estoppel as are questions of fact or mixed questions of law and fact. It has been said that "[i]t is reasonably clear that preclusion does not extend to principles of law formulated in abstract terms that could apply to completely separate fact settings," even though it is clear that preclusion "extends beyond findings of historic fact to include some determinations that mingle facts with conclusions of law." 18 Charles A. Wright, Arthur R. Miller Edward H. Cooper, Federal Practice andProcedure, § 4425 (2002). In United States v. Moser,266 U.S. 236, 45 S.Ct. 66, 69 L.Ed. 262 (1924), the Supreme Court stated that estoppel
 "does not apply to unmixed questions of law. Where, for example, a court in deciding a case has enunciated a rule of law, the parties in a subsequent action upon a different demand are not estopped from insisting that the law is otherwise, merely because the parties are the same in both cases. But a fact, question or right distinctly adjudged in the original action cannot be disputed in a subsequent action."
266 U.S. at 242, 45 S.Ct. 66 (emphasis in original). Where pure questions of law are presented to a court, the "interests of finality and judicial economy may be outweighed by other substantive policies," including avoidance of "`inequitable administration of the laws.'" Haitian Ctrs. Council, Inc. v.McNary, 969 F.2d 1350, 1356 (2d Cir. 1992), reversed on other grounds, 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993).See also Montana v. United States, 440 U.S. 147, 99 S.Ct. 970,59 L.Ed.2d 210 (1979); Restatement (Second) of Judgments §§ 27 and 28 (1982). But see United States v. Stauffer Chem. Co.,464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984).
In a criminal case, the United States Supreme Court stated that the doctrine of collateral estoppel "makes conclusive in subsequent proceedings only determinations of fact, and mixed fact and law, that were essential to the decision." Yates v.United States, 354 U.S. 298, 336, 77 S.Ct. 1064, 1 L.Ed.2d 1356
(1957) (citing, among other cases, Commissioner of InternalRevenue v. Sunnen, 333 U.S. 591, 601-02, 68 S.Ct. 715,92 L.Ed. 898 (1948)). The Alabama Court of Criminal Appeals has stated that "[c]ollateral estoppel `means simply that when an issue of ultimate fact *Page 365 
has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" Pooley v. State, 470 So.2d 1337, 1339
(Ala.Crim.App. 1985) (quoting Ashe v. Swenson, 397 U.S. 436,443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (emphasis added)).
Aside from the foregoing, it is clear that a party seeking to invoke the doctrine of collateral estoppel bears the burden of proving the elements thereof. Ted's has not done that in the present case.
The collateral estoppel argument made by Ted's focuses mostly upon the decision of the circuit court in State v. Ray Ann'sPlace. However, the record before us indicates that Ray Ann'sPlace does not satisfy the same-parties requirement because Ted's was not a party in that case. Moreover, the proper construction of the statutes at issue here was not an issue the resolution of which was necessary to the decision in Ray Ann'sPlace, because the court in that case ruled that one of the three games at issue was to be condemned because it provided an illegal cash award (and therefore did not satisfy the requirements of § 13A-12-76) and that the other two games would not be condemned because the State had failed to prove a proper chain of custody as to those machines.
Ted's also relies upon the outcome of five forfeiture actions brought in Montgomery County against Ted's and one brought in Lawrence County. The final judgments in each of the Montgomery County cases were merely orders of dismissal. Those judgments were entered based upon joint stipulations of dismissal by the parties, and no issues were actually litigated by those orders. Similarly, in the Lawrence County case, the trial court summarily disposed of an in rem forfeiture case based upon the trial court's decision in Ray Ann's Place and this court's affirmance of that decision.[7]
Based on the record before it, the trial court rejected the collateral-estoppel argument made by Ted's. We cannot conclude, on the basis of that same record, that the trial court erred in doing so.[8] *Page 366 
 III. Alabama's "Chuck E. Cheese Law" A. Initial Observations
As a basis for our discussion of the substantive issues before us, we initially note that the applicability of Alabama's criminal gambling statutes generally depends on whether a game or activity is one whose outcome depends "in a material degree upon . . . chance." This is so because of the manner in which various activities and items proscribed by those statutes are defined in § 13A-12-20. Specifically, a "slot machine" is by definition a type of "gambling device." Ala. Code 1975, § 13A-12-20(10). Both a "gambling device" and a "lottery," entail "gambling" under Ala. Code 1975, § 13A-12-20(5) and (6). "Gambling," in turn, is defined as the staking or risking of something of value upon the outcome of "a contest of chance" or some other future contingent event not under the control or influence of the player. §13A-12-20(4). Finally, a "contest of chance" is defined as "[a]ny contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." § 13A-12-20(3). Against this definitional backdrop, we find the reason for the enactment of § 13A-12-76 to be less than clear.
Section 13A-12-76, enacted by our Legislature in 1996, see
Act No. 96-588, Ala. Acts 1996, is often referred to as Alabama's "Chuck E. Cheese Law" in reference to a chain of restaurants known to cater to children and their families. As part of the statute's definition of "bona fide coin-operated amusement machines" (hereinafter "coin-operated machines" or "COMs"), §13A-12-76(e)(1) includes a list of numerous types of machines or games that, for the most part, may commonly be found in such restaurants and similar retail establishments and that, for the most part, would not appear typically to run afoul of the prohibitions against "gambling," "gambling devices," and "lotteries" in our criminal gambling statutes. Nonetheless, the Legislature enacted § 13A-12-76. We can only conclude that it did so either for the purpose of (1) affirming or ensuring the legality of certain machines that may commonly be found in restaurants and other retail establishments similar to those described above, or (2) legalizing the operation of certain machines (and the transportation of certain machines) that otherwise would be illegal under our criminal gambling statutes. To the extent the statute's purpose is the former, the State takes no issue with the statute or with the machines whose legality would thereby be affirmed; nor does our decision today implicate such machines. Rather, it is the prospect that the statute might be construed as accomplishing the latter that gives rise to the issues in the present case.
Specifically, Ted's argues that so long as a machine involves merely "some skill" or has an outcome dependent in any "part" upon the skill of the player, the machine is exempted by §13A-12-76 from the prohibitions of the criminal gambling statutes. *Page 367 
The State counters by arguing (i) that § 13A-12-76 does not operate to exempt such machines from the prohibitions of the criminal gambling statutes and (ii) that if it does, it is to that extent in contravention of § 65, Ala. Const. 1901.
 B. The "Construction" of § 13A-12-76
Ted's position as to the State's first argument is that §13A-12-76 exempts from the prohibitions of the criminal gambling statutes what § 13A-12-76 defines as "bona fide coin-operated amusement machines." Ted's emphasizes the definition of COMs in §13A-12-76(e) as machines "the result of whose operation depends in whole or in part upon the skill of the player." According to Ted's, machines that satisfy this test fall within the protection of § 13A-12-76 even if they otherwise would fall within the definitions in § 13A-12-20 of "gambling devices" or "slot machines."
The trial court agreed with Ted's argument, holding that even though skill may be "a very minor factor," the issue is whether a player, "by the application of some skill," may become entitled to reward. (Emphasis added.) See generally § 13A-12-76(a) (utilizing "some-skill" test). The trial court quoted from that portion of the definition of COMs in § 13A-12-76(e)(1) that refers to machines "the result of whose operation depends in whole or in part upon the skill of the player" and found that machines that satisfy that requirement are, by definition, not "slot machines." As the trial court stated: "The defect in [the State's argument that the machines are `slot machines'] is that if they are `bona fide amusement devices' then, by definition, they are not `slot machines.'"
The State takes the converse position, namely, that machines that are "slot machines" under § 13A-12-20(5) are, by definition, not COMs under § 13A-12-76(e)(2). The statutory issue thus becomes whether or to what extent the Legislature intended §13A-12-76 to take precedence over the criminal gambling statutes or for our criminal gambling statutes to take precedence over §13A-12-76.
If, as noted previously, the reason for the enactment of §13A-12-76 is unclear, the manner in which that statute is "constructed" makes it, and its intended relationship to the criminal gambling statutes, an enigma. To begin with, subsections (a) and (c) of § 13A-12-76, by their express terms, merely create exemptions to §§ 13A-12-70 through -75. Sections 13A-12-70
through -75 only prohibit the transportation or possession within a vehicle of certain lottery paraphernalia and authorize the seizure, condemnation, and forfeiture of vehicles transporting such paraphernalia. It is §§ 13A-12-20 through -58 that prohibit generally activities such as the possession, operation, and promotion of gambling or gambling devices.
Ted's argues, however, that subsection (d) of § 13A-12-76
constitutes an exception to all of the criminal gambling statutes by making the play of a COM legal:
 "A player of a bona fide coin-operated amusement machine may accumulate winnings for the successful play of a bona fide coin-operated amusement machine through either tokens or tickets, and may redeem these tokens or tickets for merchandise so long as the amount of tokens or tickets earned on a single play does not exceed five dollars ($5) per unit."
The biggest problem with Ted's argument is that § 13A-12-76(d), by its express terms, only purports to legalize the play of a "bona fide coin-operated amusement *Page 368 
machine."[9] That term is, in turn, expressly defined in §13A-12-76(e)(2), which provides, in part:
 "[t]he term `bona fide coin-operated amusement machine' does not include the following:
". . . .
 "j. Machines which are not legally permitted to be operated in Alabama.
"k. Slot machines.
"l. Video poker games."
The State contends, quite correctly, that this court is obliged to apply the plain meaning of this statutory language. See IMEDCorp. v. Systems Eng'g Assocs. Corp, 602 So.2d 344 (Ala. 1992). If we do so, we find that the very statute that, according to Ted's, is intended to exempt a certain set of machines from the criminal prohibitions against "gambling devices" and "slot machines," excludes those very "gambling devices" (because they are "[m]achines which are not legally permitted to be operated in Alabama") and "slot machines" from the set of machines to which the statute supposedly applies.
Ted's counters by arguing that, although this court is obliged to apply the plain meaning of the statutory language, this court also is governed by the rule of statutory construction that "it is presumed that the Legislature did not do a vain and useless thing." See Alidor v. Mobile County Comm'n, 291 Ala. 552, 558,284 So.2d 257, 261 (1973). In essence, Ted's urges us to overlook our concern with the plain language of the statute to find that the Legislature must have intended to create an exception to the criminal gambling laws for those machines described in §13A-12-76.
This court has struggled at great length to divine the full import of § 13A-12-76 and the reason for its enactment and to solve the "puzzle" of the manner in which it is structured. Our efforts to determine the proper application, if any, of the statute, without considering the effect of § 65, Alabama Const. 1901, have yielded no clear ground upon which to rest a judgment in this case. We therefore find it necessary for a proper resolution of this issue, and this case, to turn to the issue of what limits, if any, § 65 imposes on the application of §13A-12-76.[10]
 C. The Limiting Effect of § 65
The nature and the extent of the limitations imposed by § 65 of the Alabama Constitution was the subject of Opinion of theJustices No. 373, 795 So.2d 630 (Ala. 2001). The Justices began their analysis with a helpful discussion of the history of lotteries in America and in Alabama. The Court noted that, in its infancy, the United States generally regarded lotteries favorably because of the States' "weak tax base[s] and decentralized government[s]." 795 So.2d at 633. However, because of widespread fraud and social problems, lotteries came under criticism by the early 1800s. As the Justices noted:
 "Describing the social problems attending lotteries, the librarian of Congress *Page 369 
wrote that there existed `a general public conviction that lotteries are to be regarded, in direct proportion to their extension, as among the most dangerous and prolific sources of human misery.' 34 B.C.L.Rev. at 12-13, citing A.R. Spoffard, Lotteries in American History, S. Misc. Doc. No. 57, 52d Cong., 2d Sess. 194-95 (1893) (Annual Report of the American Historical Society). In fact, the problems lotteries created were of such a magnitude and were so pervasive that by the late 1800s the States were nearly unanimous in imposing constitutional prohibitions on lotteries. 34 B.C.L.Rev. at 37. Against this backdrop, Alabama included a constitutional prohibition of lotteries in its Constitution of 1875. The 1901 Constitution adopted verbatim the 1875 Constitutional language. Section 65 of the Constitution of Alabama of 1901 now provides:
 "`The legislature shall have no power to authorize lotteries or gift enterprises for any purposes, and shall pass laws to prohibit the sale in this state of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery;
and all acts, or parts of acts heretofore passed by the legislature of this state, authorizing a lottery or lotteries, and all acts amendatory thereof, or supplemental thereto, are hereby avoided.'
 "Since 1980, Alabama has adopted various constitutional amendments creating exceptions to § 65, specifically allowing the game of bingo under certain circumstances. See Ala. Const., Amendments 386, 387, 413, 440, 506, 508, 542, 549, 550, 565, 569, 599, and 612.
 "According to Sir William Blackstone in his Commentaries on the Laws of England, the term `lottery' encompassed a broad array of activities:
 "`[A]ll private lotteries by tickets, cards, or dice . . . are prohibited under a penalty . . . for him that shall erect such lotteries. . . . Public lotteries, unless by authority of parliament, and all manner of ingenious devices, under the denomination of sales or otherwise, which in the end are equivalent to lotteries, were . . . prohibited. . . .'
 "4 William Blackstone, Commentaries on the Laws of England 173. Nevertheless, Alabama courts did not initially adopt such a broad definition. Buckalew v. State, 62 Ala. 334 (1878) (persons who wagered money on a round board and spun a hand fastened in the center in an attempt to register the highest number on the rim and thereby win money did not violate anti-lottery provisions). However, this narrow view was short-lived, and Alabama courts soon defined lotteries as Blackstone did, interpreting the term `lottery' broadly, thus prohibiting a wide variety of activities. See Reeves v. State, 105 Ala. 120, 17 So. 104 (1894) (persons paying for a privilege to spin an arrow located on a circular board for a chance to win an article of jewelry or a sum of money had engaged in a prohibited lottery); Loiseau v. State, 114 Ala. 34, 36, 22 So. 138, 139 (1897) (Court expressly modified Buckalew and held slot machine to be a lottery); Johnson v. State, 137 Ala. 101, 104, 34 So. 1018, 1019 (1903) (slot machine is a lottery); Try-Me Bottling Co. v. State, 235 Ala. 207, 211, 178 So. 231, 234 (1938) (the prohibition of lotteries applies to any scheme in the nature of a lottery)."
795 So.2d at 634-35 (emphasis added).
As the Justices further noted, despite this broad interpretation of the term "lottery," the courts apparently lacked a consistently articulated standard until the *Page 370 
Supreme Court in 1938 provided the following deceptively simple definition: "`(1) A prize, (2) awarded by chance, (3) for a consideration.'" 795 So.2d at 635 (quoting Grimes v. State,235 Ala. 192, 193, 178 So. 73, 74 (1938)). "This three-pronged definition of `lottery' was based on definitions of that term used by a vast number of authorities, both judicial and nonjudicial, and it is still accepted by the overwhelming majority of jurisdictions, as well as the United States Supreme Court." Opinion of the Justices No. 373, 795 So.2d at 635 (footnote omitted).[11]
With the foregoing perspective and historical context for Alabama's adoption of a constitutional ban on "lotteries" and "schemes in the nature of lotteries," the Justices next considered "[t]wo dominant paradigms" that had evolved concerning the roles of skill and chance in defining a lottery: the "English Rule," under which only a scheme that exhibits or involves "pure chance" is a lottery, and the "American Rule," under which it is possible for a game or activity to be considered a lottery even if skill is involved in determining its outcome. The opinion then engages in a thorough and erudite discussion of Opinion of theJustices No. 358, 692 So.2d 107 (Ala. 1997), and related authorities, which is equally applicable to the question before us today. That discussion, found in Part III of Opinion of theJustices No. 373, need not be set out in its entirety in this opinion; instead, we adopt that discussion and incorporate it by reference and, in so doing, acknowledge the rejection by the Justices of the so-called "English Rule."
In explaining the degree of skill required to avoid the anti-lottery provisions of § 65, the Justices wrote:
 "As stated previously, § 65 not only prohibits lotteries, but it also prohibits any `gift enterprise' or `scheme in the nature of a lottery.' `In this State, therefore, the public policy is emphatically declared against lotteries, or any scheme in the nature of a lottery, both by Constitution and by statutes.' (Emphasis added in Opinion No. 373.) Try-Me Bottling Co., 235 Ala. [207] at 212, 178 So. [231] at 234 [(1938)].
 "`In Try-Me Bottling Co. . . . this court expressly called attention to the broad conception set forth in § 65 showing that the prohibition is not only against lotteries but also against any scheme in the nature of a lottery. The very purpose of this broad declaration was to put a ban on any effort at evasion or subterfuge. Whatever may be the view of the courts of other states on the subject of lotteries, these cases show that this court has adopted a broad view of the meaning of the constitutional provision which does not admit of quibbling or narrow construction.'
 "Opinion [of the Justices] No. 83, 249 Ala. [516] at 518, 31 So.2d [753] at 755 [(1947)]. (Emphasis added in Opinion No. 373.) Moreover, the fact that it was necessary to amend the Constitution to except `bingo' from § 65's blanket prohibition on lotteries also demonstrates the broad construction that section has been given.
 "In 1981, the Justices of this Court, quoting Yellow-Stone Kit [v. State], 88 Ala. 196, 7 So. 338
[(1889)], stated: `"[t]he courts have shown a general disposition to bring within the term `lottery' every species of gaming, involving a disposition of prizes by lot or chance, . . . which comes within the mischief to *Page 371 
be remedied-regarding always the substance and not the semblance of things, so as to prevent evasions of the law. . . ."' Opinion of the Justices No. 277, 397 So.2d 546, 547 (Ala. 1981). (Emphasis added in Opinion No. 373.) Indeed, the Constitution's broad prohibition on all lotteries is evident because the Constitution explicitly condemns `any scheme' containing elements that would make the scheme resemble a lottery."
795 So.2d at 640.
The Justices then concluded that Alabama follows the so-called "American Rule" and that whether a game or activity is prohibited by § 65 of our Constitution depends on whether the outcome of that game or activity is determined predominately by skill or by chance. The Justices stated:
 "`If the result of the distribution is to be determined solely by skill or judgment, the scheme is not a lottery, even though the result is uncertain or may be affected by things unforseen and accidental. Where elements both of skill and of chance enter into a contest, the determination of its character as a lottery or not is generally held to depend on which is the dominating element.'"
795 So.2d at 641 (quoting 54 C.J.S. Lotteries § 4 (1987)).
Alabama's acceptance of the "American Rule" is traceable to our Supreme Court's opinion in Minges v. City of Birmingham,251 Ala. 65, 36 So.2d 93 (1948). Quoting from AmericanJurisprudence, the Court in Minges described the prevailing rule regarding lotteries as follows:
 "`Chance, as one of the elements of a lottery, has reference to the attempt to attain certain ends, not by skill or any known or fixed rules, but by the happening of a subsequent event, incapable of ascertainment or accomplishment by means of human foresight or ingenuity. . . . In the United States, however, by what appears to be the weight of authority at the present day, it is not necessary that this element of chance be pure chance, but it may be accompanied by an element of calculation or even of certainty; that is sufficient if chance is the dominant or controlling factor.'"
Minges, 251 Ala. at 69, 36 So.2d at 96 (quoting 34 Am.Jur.,Lotteries, § 6 (1941)). The Supreme Court then continued its quotation from American Jurisprudence, explaining that "`the rule that chance must be the dominant factor is to be taken in the qualitative or causative sense, rather than the quantitative sense.'" 251 Ala. at 69, 36 So.2d at 96.
What it means for either skill or chance to be predominant, and to be so in a "qualitative or causative" sense, was addressed in the oft-cited decision in State ex Inf. McKittrick v.Globe-Democrat Publishing Co., 341 Mo. 862, 110 S.W.2d 705
(1937). In McKittrick, the Missouri Supreme Court considered the issue of whether a puzzle contest sponsored by a newspaper was a lottery. The contest involved a series of cartoons published over a period of time, each of which contained clues as to the name of a famous individual. When the first cartoons were published, the clues were simple and the lists of names provided to aid contestants in solving the puzzles were short. As the contest progressed, the cartoons became more subtle, the lists of names from which to choose became longer, and the task of determining the correct name became more difficult. As to some of the cartoons near the end of the contest, however, more than one name was "equally appropriate" and, therefore, a contestant's selection of the winning name became a matter of chance.341 Mo. at 879, 110 S.W.2d at 715. With those facts before it, the Missouri Supreme Court undertook what it *Page 372 
called a "tedious review" of the then extant cases.341 Mo. at 881, 110 S.W.2d at 716. This review, explained the Court,
 "shows the ingenuity with which efforts have been made to circumvent lottery laws by devising contests for a consideration which purport to be and in some degree actually are contests of skill, although their obvious, intended, and widely disseminated appeal is to chance. . . . These schemes have always been branded as mischievous. . . . [I]t is safe to say that for the public good such schemes should be scanned by the courts with a scrutinous eye."
341 Mo. at 881, 110 S.W.2d at 716-17. The Missouri Court then drew the following conclusion from its review of the cases:
 "[T]he fact that skill alone [would] bring contestants to a correct solution of a greater part of the problems does not make the contest any the less a lottery if chance enters into the solution of another lesser part of the problems and thereby proximately influences the final result."
341 Mo. at 881, 110 S.W.2d at 717 (emphasis added).[12]
The McKittrick Court based its analysis upon the same principle relied upon by our Supreme Court in Minges, explaining, as did the Minges Court, that "the rule that chance must be the dominant factor is to be taken in a qualitative or causative sense rather than in a quantitative sense," and noting that the issue therefore is not "the mere proportions of skill and chance entering in the contest as a whole." 341 Mo. at 881,110 S.W.2d at 717. The Missouri Court went on to say:
 "The same thought is reflected in Eastman v. Armstrong-Byrd Music Co., [212 F. 662 (8th Cir. 1914)], where it was stated that, if a contest `rests upon a determination in whole or in part by chance,' it is a lottery; and in Commonwealth v. Theatre Advertising Co., 286 Mass. 405, 410, 190 N.E. 518, 520 [(1934)], which proceeds on the theory that the true inquiry is whether chance inheres in the contest, or whether it is merely incidental; and in Horner v. United States, 147 U.S. 449, 459, 13 S.Ct. 409, 37 L.Ed. 237 [(1893)], where a scheme for selling bonds was held a lottery because `the element of certainty goes hand in hand with the element of lot or chance, and the [element of certainty] does not destroy the existence or effect of the [element of chance].'"
341 Mo. at 881, 110 S.W.2d at 717 (final emphasis added).
The same principle applied in McKittrick may be found in many other opinions issued both before and since McKittrick, and it remains sound today. In another oft-cited case decided not too long after Alabama's adoption of the 1901 Constitution,Commonwealth v. Plissner, 295 Mass. 457, 4 N.E.2d 241 (1936), the Massachusetts Supreme Court affirmed its acceptance of the widely used three-element test for the definition of a lottery, i.e., "payment of a price for the chance of a prize, the result depending on or being determined by chance."295 Mass. at 463, 4 N.E.2d at 244 (emphasis added). The court explained that "[t]he mere fact that skill as well as chance may enter into a game, however, does not prevent it from *Page 373 
being a lottery. . . . With reference to cases where both elements are present, the rule generally stated is that if the element of chance rather than that of skill predominates, the game may be found to be a lottery." 295 Mass. at 463,4 N.E.2d at 244.
The Plissner holding was recently applied by the United States Court of Appeals for the First Circuit in its holding that chance predominated over skill in the playing of a "video-poker" game, thereby rendering it a lottery. In United States v.Marder, 48 F.3d 564 (1st Cir. 1995), the court held that, under Massachusetts law, whether a game or activity is a lottery depends on whether chance "predominate[s] over skill in the results of the game" or, in other words, whether the element of chance was present in such a manner as to "thwart the exercise of skill". 48 F.3d at 569.
The same language found in § 65, Ala. Const. 1901, was actually first adopted as part of the Alabama Constitution of 1875. In 1893, 18 years after this provision was first made part of Alabama's organic law, and just 8 years before the inclusion of the same provision verbatim in the Alabama Constitution of 1901, the United States Supreme Court had occasion to collate the then extant cases regarding the definition of the term "lottery." SeeHorner v. United States, 147 U.S. 449, 13 S.Ct. 409,37 L.Ed. 237 (1893). The Supreme Court found it dispositive that the scheme in the case before it was one in which "[t]he element of certainty [went] hand in hand with the element of lot or chance," but that "the former [did] not destroy the existence or effect of the latter." 147 U.S. at 459, 13 S.Ct. 409.
Similarly, in 1905, the Ohio Supreme Court explained that "if the dominating, determining element is one of chance, that element gives character to the whole scheme." See Stevens v.Cincinnati Times-Star Co., 72 Ohio St. 112, 148, 73 N.E. 1058,1061 (1905).
More recently, in Morrow v. State, 511 P.2d 127 (Alaska 1973), the Alaska Supreme Court recognized that, in determining whether a given enterprise constitutes a lottery, the courts generally employ either the "English Rule," which the Alaska Supreme Court referred to as the "pure-chance doctrine," or the American Rule, which the court referred to as "the dominant-factor doctrine." 511 P.2d at 129. After noting that most jurisdictions favor the dominant-factor doctrine, the court outlined a number of "aspects" which it held to be required in order for a scheme to be one in which "skill predominates over chance,"[13] and thereby not a lottery. 511 P.2d at 129. One of those "aspects" identified by the court is the following:
 "Skill or the competitors' efforts must sufficiently govern the result. Skill must control the final result, not just one part of the larger scheme. . . . Where `chance enters into the solution of another lesser part of the problems and thereby proximately influences the final result,' the scheme is a lottery. . . . Where skill does not destroy the dominant effect of chance, the scheme is a lottery. Horner v. United States, 147 U.S. 449, 459, 13 S.Ct. 409, 37 L.Ed. 237 . . . (1893)." *Page 374 
Morrow, 511 P.2d at 129 (emphasis added).[14]
In Sherwood Roberts-Yakima, Inc. v. Leach, 67 Wash.2d 630,409 P.2d 160 (1966), the Washington Supreme Court stated:
 "Chance within the lottery statute is one which dominates over skill or judgment. The measure is a qualitative one; that is, the chance must be an integral part which influences the result. The measure is not the quantitative proportion of skill and chance in viewing the scheme as a whole."
67 Wash.2d at 634-35, 409 P.2d at 163 (emphasis added; citingMcKittrick).[15] See also Opinion of the Justices No.373, 795 So.2d at 643 (stating that where chance is the "nature or outcome-determining factor of the game, [such chance] dominates over" what the Justices referred to as "skill" for purposes of that opinion).[16]
Based on the foregoing, we conclude that whether a game or activity constitutes a "lottery" depends on whether chance remains "an integral part which influences the result" — is chance meaningful in determining the outcome of the game — or does skill override the effect of the chance? Does chance, as theMcKittrick Court put it, "proximately influence the final result," or does skill, in the words of the United States Supreme Court in Horner,"destroy the existence or effect" of the chance? If the former and not the latter, it can hardly be said that the skill predominates over the chance in the qualitative or causative sense contemplated.[17]
As long as chance matters — as long as chance makes a meaningful difference in the outcome — the activity differs in kind, not just in degree, from a game of skill. The issue is whether the nature of the game is such that the role of chance in determining the outcome is thwarted by the skill involved, or whether chance meaningfully alters the outcome and thereby predominates over the skill.
D. The Meaning of the Word "Skill"
In the present case, however, Ted's also argues over the meaning of the word *Page 375 
"skill." Ted's elicited and seeks to rely upon testimony (1) that identifying that a game is a game is a "skill," (2) that finding and understanding the directions of a game is a "skill," (3) that "finding where the coin goes [is] a skill," (4) that "finding which button to press" is a "skill," and (5) "that actually playing the game [is] a skill."[18] Ted's also relies upon testimony that "skill" would include a "strategy or tactic based on knowledge of a particular game's features," on the rules of the game, the knowledge of probabilities, and "the ability to see what is relevant or significant in a particular game."
In essence, Ted's argues that, if a machine requires some physical human act to initiate or continue its operation, or if some human decision can increase or decrease the amount wagered and therefore the amount won or lost in a given play or series of plays, the machine thereby becomes a game of skill, even if the ultimate determinant of whether a contestant actually wins or loses on any given play or on a series of plays is chance.
To define skill in the manner urged by Ted's would require this court (1) to abandon common sense, (2) to ignore the plain meaning of the word "skill," and (3) to define "chance" out of existence for purposes of § 65 of the Alabama Constitution. It would require us to define "skill" so liberally that, as a practical matter, any game would become a "game of skill." We decline to do this.
This court has a duty to use its common sense. We also have a duty to apply the plain meaning of words when possible. See,e.g., Ex parte McLeod, 841 So.2d 260 (Ala. 2001); BirminghamRealty Co. v. Jefferson County Bd. of Equalization Adjustment,669 So.2d 956 (Ala.Civ.App. 1995). Moreover, this court has a responsibility to afford the intended meaning to the prohibitions on "lotteries" and "scheme[s] in the nature of a lottery" that the people of Alabama, in their wisdom, have chosen to include and maintain as part of their fundamental law. With our decision today, we meet those duties and fulfill that responsibility. As part of our doing so, we recognize the obvious: the word "skill" does not speak to a person's ability to recognize that "a game is a game," or to insert a coin in a slot, or to pull a lever, or to locate a button. Rather, the word "skill" speaks to the ability, through the application of human physical or mental capacity, to actually cause a desired outcome of a game when the game is played.
Further, the mere fact that the outcome of a game, either in a single play or over multiple plays, can be affected by an understanding of the laws of probability or an understanding of the rules of the game, or can be affected by other recognizable techniques or knowledge, does not change the fundamental nature of that game. Simply put, a player's understanding of the rules or of the laws of probability relating to a game of chance does not change the fact that he is playing a game of chance. A player may be "skilled" at "playing the odds," but he is still "playing the odds." *Page 376 
 IV. Conclusion
In light of the foregoing, we hold that § 13A-12-76, Ala. Code 1975, may not be applied in the manner urged by Ted's. To the contrary, § 13A-12-76 may not, without contravening § 65 of the Alabama Constitution, be applied so as to legalize games or activities in which skill does not, as discussed herein, predominate over chance in determining the outcome.
That portion of the trial court's judgment relating to the State's declaratory-judgment claim is reversed, and a judgment is rendered for the State in accordance with this opinion.
REVERSED AND JUDGMENT RENDERED.
YATES, P.J., and CRAWLEY, THOMPSON, and PITTMAN, JJ., concur.
[1] The State subsequently moved for the entry of default judgments against Myers Country Store, Satsuma Chevron, Starvin Marvin # 2, Starvin Marvin # 3, and Papa Joe's; the trial court granted each of those motions in April 1999.
[2] At trial, Ted's attempted to make an "estoppel" argument based upon the State's return of the 12 machines. When questioned by the trial court as to whether the State had an obligation to "confiscate" any machines the State contended were illegal, the attorney for the State represented that there were many more machines located in Mobile County and that there was not enough manpower to seize all such machines. The State's attorney continued:
 "In addition, during our settlement negotiations, it was discussed and [a representative of Ted's] was there, and [the representative] and [counsel for Ted's] said: Why place all of our games at risk? Why can't we just keep one or two or something and ask for a declaratory judgment? And I thought their idea was brilliant, and so I filed a declaratory judgment, and that's why we are here today."
Ted's does not reassert this particular estoppel argument on appeal.
[3] In addition to the 20 machines the State originally seized, an employee of Ted's testified that Ted's had leased machines to 60 convenience stores throughout Mobile and Baldwin Counties; Ted's also admitted that it had machines in other Alabama counties. The employee also testified that Ted's maintained four administrative offices throughout Alabama, in Huntsville, Birmingham, Dothan, and Mobile. Another employee of Ted's, who had served as a branch manager in Ted's Mobile office, testified that he was responsible for supplying customers with 180 to 220 machines, although it was not clear that all of those machines were located within Alabama. Ted's introduced evidence that it advised the convenience stores and the other establishments that were its customers as to the necessity of complying with Ala. Code 1975, § 13A-12-76, with respect to the machines it supplied.
[4] The State's motion also requested that the trial court rule on whether the currency that was in the eight machines when they were seized was also subject to forfeiture. On November 3, 2000, the trial court entered an order ruling in the State's favor as to this issue.
[5] The State's request for a declaratory judgment is particularly appropriate in this case; in addition to the 12 machines as to which the State dismissed its forfeiture action in conjunction with seeking a declaratory judgment, Ted's has a large number of other machines in Mobile County and elsewhere in Alabama that it seeks to operate in compliance with and under the auspices of § 13A-12-76. By seeking a declaratory judgment as to the issues raised in this appeal, the State seeks to determine the rights of both Ted's and the State so that the State can appropriately gauge its efforts to protect the public interest.See generally Ala. Code 1975, § 6-6-223. The trial court's entry of a judgment adverse to the State will, if not reversed on appeal, have an adverse impact on how the State enforces the criminal gambling statutes as to other machines. See PersonnelBd. of Jefferson County, 475 So.2d at 866 (determining that, even though the trial court held in favor of a sheriff on an employee's complaint, the sheriff could cross-appeal from an adverse declaratory judgment that the complaint was properly a matter for a grievance committee's consideration, because that judgment might prejudicially affect the sheriff's authority to assign and discipline other subordinates).
[6] This court affirmed the trial court's judgment in State v.Ray Ann's Place, but did so pursuant to Rule 53, Ala. R.App. P., without issuing an opinion. See State v. Ray Ann's Place
(No. 2980541), 789 So.2d 248 (Ala.Civ.App. 1999) (table).
[7] In its brief, Ted's explains that the trial court's decision in Ray Ann's Place and this court's affirmance of that decision "resulted in the dismissal of similar forfeiture actions pending against Ted's in Montgomery and Lawrence counties." In its reply brief, the State notes that the Lawrence County and Montgomery County cases were dismissed by joint stipulation.
As previously noted, this court affirmed the trial court's judgment in Ray Ann's Place without an opinion pursuant to Rule 53, Ala. R.App. P. Therefore, this court's decision in that case is not precedential authority. See Rule 53(d), Ala. R.App. P. Furthermore, on the denial of rehearing in Ray Ann'sPlace, 765 So.2d 19 (Ala.Civ.App. 2000), two members of this court concurred specially in an opinion in which they indicated that the reason this court affirmed the trial court's decision dismissing the forfeiture action against two of the machines was merely that a proper chain of custody as to those machines could not be established. 765 So.2d at 19 (Monroe, J., concurring specially, joined by Yates, J.).
[8] In addition to the issues already discussed, a number of other concerns arise regarding the merits of a collateral-estoppel argument in a case such as this. These include the proper operation of collateral estoppel based upon a prior in rem proceeding; whether collateral estoppel operates against the State in the same manner it operates against private individuals; the fact that this case involves the adjudication of "public rights"; the need to apply the doctrine of collateral estoppel "in particular situations as fairness and justice require," and not "so rigidly as to defeat the ends of justice," 46 Am.Jur.2d, Judgments, § 522 at 786-87 (1994); and the need to "weigh" the importance of the doctrine of collateral estoppel "as the embodiment of a public policy" (the desirability of finality) against "competing interests" and "other policies," such as "the public interest in reaching the right result," id.
We need not address these additional concerns in light of the dispositive issues already addressed.
Even if we were to resolve both the issues addressed in the text and the aforementioned additional concerns against the State and thereby conclude that the State is collaterally estopped from contending that § 13A-12-76 does not legalize "gambling devices" and "slot machines" as defined in § 13A-12-20, our ultimate resolution of this case would not change. Indeed, a finding that the State was collaterally estopped from contending that §13A-12-76 does not legalize such machines would propel us directly to the issue of whether § 13A-12-76, as so applied, would be constitutional under § 65, Ala. Const. 1901. See
discussion in Part III.C.
[9] The argument also fails to address the fact that §13A-12-76(d) only purports to permit a "player" to "accumulate winnings" from playing COMs; it does not purport to permit the "possession" or the "promotion" that are also prohibited by the criminal gambling statutes.
[10] The confusion created by the manner in which § 13A-12-76
is structured and worded, the competing tenets of statutory construction that are applicable, and the close nature of the question would in any event implicate constitutional considerations in light of the bias in our jurisprudence against construing a statute in a manner that renders it unconstitutional. See, e.g., Ex parte Huguley Water Sys.,282 Ala. 633, 639, 213 So.2d 799, 805 (1968).
[11] As the Justices also noted, "Black's Law Dictionary (5th ed. 1979) succinctly defines `lottery' to mean `a chance for a prize for a price.'" 795 So.2d at 635 n. 3.
[12] The McKittrick court further explained that whether the element of chance was present for purposes of determining the existence of a lottery must be viewed "from the standpoint of the nearly 70,000 persons who entered the contest" and not by "any absolute or technical standards." 341 Mo. at 882,110 S.W.2d at 717. In other words, "whether chance or skill was the determining factor in the contest must depend upon the capacity of the general public — not experts — to solve the problems presented."Id.
[13] According to Webster's Third New InternationalDictionary (1971), the word "predominate" has two different meanings. The first is "to exert controlling power or influence," "to govern, prevail, rule." The latter is "to hold advantage in number or quantity" or to be "preponderant." The explanation in the caselaw as to what it means for chance to be the dominant factor in a game or activity is consistent with the first definition.
[14] The court also emphasized that "[w]here the contest is aimed at the capacity of the general public, the average person must have the skill, but not every person need have the skill."Morrow, 511 P.2d at 129.
[15] Likewise in State v. ITM, Inc., 52 Misc.2d 39,275 N.Y.S.2d 303 (Sup.Ct. 1966), the court considered the degree to which chance must affect the result of a game for the game to be considered a lottery. The measure, according to the court, "`is not the quantitative proportion of skill and chance in viewing the scheme as a whole.'" 52 Misc.2d at 59, 275 N.Y.S.2d at 326
(quoting Leach, 67 Wash.2d at 635, 409 P.2d at 163). Rather, according to the court, the test is whether "chance [is] an integral part" of the contest that affects the entire scheme.
[16] As several of the cases discussed recognize, a game could be structured so that the exercise of true skill (as opposed to the so-called "skill" discussed in Part III.D.) quantitatively may constitute a greater part of the game or quantitatively may increase a player's odds of winning, either on a single play or on a series of plays. The constitutional infirmity would remain, however, if an actual win for the player, either on one play or on a series of plays, ultimately remained a causative or qualitative function of those odds, or chance — e.g., the electronic "turn" of a "card" or "spin" of a "wheel."
[17] One way to illustrate what it means for chance to predominate from a qualitative, rather than from a quantitative, standpoint, that would leave little room for misunderstanding or debate, would be to consider a modified game of "Russian roulette." If a contestant, by prevailing in preliminary contests of skill, could remove all but a single bullet from the chambers of a revolver, one would still be hard-pressed to persuade a contestant who had done so that his "winning" or "losing" no longer depended upon chance.
[18] Ted's also seeks to rely on testimony regarding what are referred to as "skill-stop buttons," the presence of which on a machine suggests to the contestant that he or she may, if skillful enough, control the point at which a spinning wheel will stop, thereby causing it to display a winning symbol. Ted's own expert, however, testified that such games were "clearly chance predominant." The State's expert testified at length regarding so-called "skill-stop buttons," explaining how such buttons work and why the appearance that the buttons enable a contestant to control when a wheel will stop spinning and thereby influence the outcome of a game is illusory.